1  Christopher Celentino (State Bar No. 131688)
   Christopher B. Ghio (State Bar No. 259094)
2  Yosina M. Lissebeck (State Bar No. 201654)
3  **DINSMORE & SHOHL LLP**
   655 West Broadway, Ste 800
4  San Diego, California 92101
   Tele: (619) 400-0500
5  Fax:  (619) 400-0501
   Christopher.Celentino@dinsmore.com
6  Christopher.Ghio@dinsmore.com
   Yosina.Lissebeck@dinsmore.com
7
8  M. Trent Spurlock (KY Bar No. 88569)
   Suzanne M. Marino (KY Bar No. 99070)
9  **DINSMORE & SHOHL LLP**
   101 S. Fifth St., Ste 2500
10 Louisville, KY 40206
   Tele: (502) 540-2300
11 Fax:  (502) 585-2207
   (Admitted pro hac vice)
12
   Attorneys for Richard A. Marshack,
13 Trustee of the LPG Liquidation Trust

14          **UNITED STATES BANKRUPTCY COURT**

15    **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

| | |
|---|---|
| 16  In re: | Case No.: 8:23-bk-10571-SC |
| 17  The Litigation Practice Group P.C. | Adv. Proc. No.: |
| 18           Debtor. | Chapter 11 |
| 19  Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **COMPLAINT FOR:** |
| 20 | |
| 21          Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| 22  v. | |
| 23  YNS Funding, LLC, a New York limited liability company; Aly Management, LLC, a New York limited liability company; and Yitzchok Blum, an individual; | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| 24 | |
| 25 | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| 26          Defendants. | |
| 27 | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| 28 | |

**(5) TURNOVER; AND**

**(6) AIDING AND ABETTING AGAINST BLUM**

Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Aiding and Abetting Against Blum* ("Complaint"), plaintiff Richard A. Marshack, liquidating trustee of the The Litigation Practice Group P.C. ("Debtor" or "LPG") Liquidation Trust (collectively, "Trustee" or "Plaintiff") for the Debtor's bankruptcy estate ("Estate") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.      Plaintiff, Richard A. Marshack, was the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.      Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant YNS Funding, LLC ("YNS"), is, and at all material times represented that it was, a limited liability company existing under the laws of the State of New York.

8.      YNS may be served by first class mail postage prepaid upon YNS's authorized agent for service of process, The LLC, at 5308 13th Ave., Ste. 422, Brooklyn, New York 11219.

9.      Defendant Aly Management LLC ("Aly") is, and at all material times represented that it was, a limited liability company existing under the laws of the State of New York.

10.     Aly may be served by first class mail postage prepaid upon Aly's authorized agent for service of process, Corporate Filings of New York, at 90 State St., Ste. 700, Office 40, Albany, New York 12207.

11.     Defendant Yitzchok Blum a.k.a Yitz Blum a.k.a Yan Blum ("Blum") is, and at all material times was, an individual residing in the State of New York.

12.     Upon information and belief, Blum was at all material times, a principal and/or agent of YNS and Aly.

13.     Blum may be served by first class mail postage prepaid at 1320 53rd St. Apt. R3, Brooklyn, NY 11219-3883.

/ / /

/ / /

/ / /

/ / /

3

## GENERAL ALLEGATIONS

### A.    The Bankruptcy Case

14.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid numerous pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al.*, Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super. Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al.*, Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others.  In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and from client payments made pursuant to LPG's client Legal Services Agreements ("Client Funds"), Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.  The 1046 Action primarily seeks avoidance, recovery and damages arising out of the wholesale fraudulent transfer of client files and the related ACH Receivables.  This action deals primarily with the fraudulent transfers of LPG funds, including its Client Funds, to Defendants YNS and Aly.

15.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

/ / /

/ / /

/ / /

4

16.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

17.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

18.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time.  [Bankr. Docket Nos. 1646 & 1762].

19.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

20.    On or about May 2, 2024, Plaintiff filed a Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

/ / /

5

21.    On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached hereto as **Exhibit 1** and incorporated herein by reference.

22.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG**

23.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

24.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

25.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

26.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

27.    LPG mismanaged the consumers' monthly payments.

28.    Tony Diab is, and at all relevant times was, an individual who operated, dominated and controlled LPG ("Diab"). Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

29.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

30.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

/ / /

1     31.    Because LPG received payments from consumers over time, it often sought financing

2 by borrowing against its future cash flows from the Accounts Receivable by means of, among other

3 things, merchant cash advance agreements ("MCA Agreements"). This borrowing was not only used

4 to finance operations at LPG and to pay fees owed to the marketing companies for providing the client

5 referrals but also was used to pay creditors that had provided earlier-in-time financing in a growing

6 Ponzi scheme.

7     32.    Many of the documents executed in connection with such financing described the

8 transactions as account receivable purchase agreements.  However, LPG was not selling accounts

9 receivable to MCA lenders, it was obtaining short term loans in return for the transfer of future

10 monthly payments made by clients that were required to be held in client-trust accounts.

11     33.    To facilitate the transfer of ACH Receivables to MCA lenders, Diab used entities he

12 controlled, and were his alter egos, including, without limitation, Vulcan Consulting Group

13 ("Vulcan"), BAT Inc. (d/b/a "Coast Processing"), Maverick Management Group LLC ("Maverick")

14 and Prime Logix to divert LPG consumer funds and ACH Receivables. Diab would use numerous

15 ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities

16 he controlled, without oversight or detection, and to avoid payment disputes and complications.  The

17 money that flowed from Debtor through these bank accounts to Defendants consisted of Client Funds

18 that Debtor funneled to these entities by means of the ACH processing companies.  Debtor also made

19 deposits into these entities bank account such that they received Client Funds directly from Debtor in

20 addition to direct Accounts Receivable.

21     34.    LPG transferred ACH Receivables and the associated Client Funds in this fashion to

22 defraud creditors in a pyramid scheme and for improper personal gain.

23     35.    LPG's monthly revenue from client files was primarily received via ACH payments.

24 To process ACH payments, LPG was required to enlist the services of ACH payment processing

25 companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH

26 processing companies to easily switch between different vendors and have millions of dollars of LPG

27 funds directed to entities Diab controlled, including but not limited to Vulcan, Maverick, BAT and

28 others. Diab utilized these other entities' bank accounts as LPG bank accounts.

36.    Diab instructed lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts he controlled on behalf of LPG but ostensibly held by Vulcan, BAT, Maverick or others.  Diab used all of these proceeds as if they were LPG funds, because they were.

37.    Diab frequently diverted the LPG money pulled from its consumer clients and other funds it received through investors and lenders.

38.    Diab frequently would direct these entities to pay LPG affiliates (aka marketing cappers), MCA lenders, and others with LPG assets.

39.    Diab would instruct others at LPG and these entities on how to manage and transfer these funds to and from these entities and LPG interchangeably.

### (i)    MCA Agreements

40.    As part of its business, Debtor LPG routinely entered into merchant cash advance agreements with lenders and investors, including marketing companies, and individuals ("MCA Agreements") many of whom are defendants in other adversary actions brought by the Trustee.

41.    The MCA Agreements purported to sell the Debtor's ACH Receivables to third parties.

42.    Traditional merchant cash advances are a variation of "factoring" where a merchant sells a discounted portion of its accounts receivable, and the purchaser receives in return the actual income from the accounts receivable it purchased.  The amount paid to purchase the receivables is lower than the expected income thereby giving the seller a source of cash while losing the long-term benefit of the accounts receivable that it sold.

43.    The MCA Agreement transfers in this instance, however, were loans, not purchases of accounts receivable.  The reason for characterizing the transactions as a "purchase" rather than a loan was to avoid the application of usury laws.

/ / /

/ / /

/ / /

/ / /

44.    Under LPG's standard MCA Agreements, LPG did not sell the Accounts Receivable to the other party. Instead, LPG sold its interest in future income to the other party, but the obligation to actually collect and the risk of non-payment of the receivable remained with LPG. These transactions were loans, not sales, because under the MCA Agreements, the other party bore little, if any, risk of ownership of the subject receivables.

45.    If any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

46.    Because the MCA Agreements violate federal and state law as loans carrying usurious interest rates, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under MCA Agreements was unlawful.

47.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

**D.    Diab's Scheme**

48.    As discussed above, the Debtor borrowed against its future ACH Receivables by purporting to transfer them to factoring companies pursuant to MCA Agreements or similar transactions.  In many instances, the ACH Receivables were transferred multiple times.

49.    Given that all or a substantial portion of Debtor's ACH Receivables were transferred multiple times, there were more claims for payment from any one ACH Receivable than the receivable would generate.  Thus, prior to the Petition Date, Debtor engaged in a scheme to defraud its creditors by transferring funds from clients in the form of future Accounts Receivable to various fraudulent conveyance partners as alleged herein.

**E.    Aly's Dealings with LPG**

50.    Upon information and belief, LPG entered into a purported MCA Agreement with Aly and/or Aly participating in funding, in whole or part, an MCA agreement between LPG and YNS or other entities.

51.    Upon information and belief, Aly was among the transferees of LPG's Accounts Receivable, Client Funds and/or other LPG funds as repayment for a purported MCA Agreement between LPG and Aly, YNS or others.

52.    Upon information and belief, Blum facilitated the above-described MCA Agreement.

53.    On or about November 3, 2022, LPG transferred $125,000.00 to Aly via a book transfer debit.  A true and accurate summary of LPG's disbursement to Aly is attached hereto as **Exhibit 2** and incorporated herein by reference.

54.    Upon information and belief, Aly provided no consideration or, in the alternative, provided insufficient consideration in exchange for the $125,000.00 payment from LPG.

**F.    YNS's Dealings with LPG**

55.    YNS entered into purported MCA Agreements with YNS.

56.    YNS was among the transferees of LPG's Accounts Receivable, Client Funds and/or other LPG funds as repayment for purported MCA Agreements between YNS and LPG.

57.    Upon information and belief, Blum facilitated the MCA Agreements between YNS and LPG on behalf of YNS.

(i)      **YNS's First MCA Agreement with LPG**

58.    On or about November 7, 2022, YNS entered into a Merchant Cash Advance Agreement (the "First YNS MCA") with Debtor. A true and accurate copy of the First YNS MCA is attached hereto as **Exhibit 3** and incorporated herein by reference.

59.    The terms of the First YNS MCA are:

Purchase Price:              $500,000.00

Purchased Amount:           $749,500.00

Specified Percentage:       25.00%

Net Funds Provided:         $500,000

Initial Estimated Payment:   $12,491.67 per day

60.    The stated effect of these terms is that in exchange for $500,000, YNS would receive $749,500 in 60 days *or a return of $249,000 on its $500,000 (49.8%)*.

61.    The transaction entered pursuant to the First YNS MCA constituted a loan with a usurious interest rate that was not made in the ordinary course of business.

(ii)     **YNS's Second MCA Agreement with LPG**

62.    On or about November 22, 2022, YNS entered into another Merchant Cash Advance Agreement (the "Second YNS MCA") with Debtor. A true and accurate copy of the Second YNS MCA is attached hereto as **Exhibit 4** and incorporated herein by reference.

63.    The terms of the Second YNS MCA are:

Purchase Price:              $1,100,000.00

Purchased Amount:           $1,648,900.00

Specified Percentage:       25.00%

Net Funds Provided:         $1,100,000

Initial Estimated Payment:   $32,978.00 per day

64.    The stated effect of these terms is that in exchange for $1,100,000, YNS would receive $1,648,900 in 50 days *or a return of $548,900 on its $1,100,000 (49.9%)*.

65.    The transaction entered pursuant to the Second YNS MCA constituted a loan with a usurious interest rate that was not made in the ordinary course of business.

**(iii)**    **LPG's Payments to YNS**

66.    Debtor, through payments from LPG accounts and Vulcan, made the following payments to YNS :

- LPG sent $400,000.00 to YNS on November 4, 2022 via wire with a memo line of "Lead Generation"

- LPG sent $525,000.00 to YNS on November 14, 2022 via wire with a memo line of "Lead Purchase"

- LPG sent $12,491.67 to YNS on November 14, 2022

- LPG sent $12,491.67 to YNS on November 15, 2022

- LPG sent $12,491.67 to YNS on November 15, 2022 (two identical payments on this date)

- LPG sent $12,491.67 to YNS on November 16, 2022, and

- LPG, through Diab's Vulcan Consulting Group LLC account, sent $535,000.00 to YNS on November 18, 2022.

A true and accurate summary of LPG's disbursements to YNS is attached hereto as **Exhibit 5** and incorporated herein by reference (these payments to YNS and the above-described payment to Aly are hereinafter labeled "Transfers").

**G.    Unlawful Nature of MCA Agreements with YNS and Aly**

67.    The Debtor did not receive reasonably equivalent value in exchange for the Transfers because the underlying MCA Agreements contained usurious interest rates, required the Debtor to repay over three times the amount of the money it actually borrowed over a short term, and/or withheld substantial sums from the amount loaned or paid to purchase receivables as "fees" such that the Debtor was obligated to repay amounts it never borrowed or obtained. To the extent known to the Trustee, the specifics of the transactions are set out *supra* and are incorporated by reference herein.

68.    In addition, on information and belief, the loans made to the Debtor in the guise of Defendants' MCA Agreements was usurious at an interest rate many times more than the enforceable rate permitted by usury laws and, in particular, the usury laws of California. The debt evidenced by the MCA Agreements further constitutes an "unlawful debt" within the meaning of 18 U.S.C. §

1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d).  Accordingly, Plaintiff may recover treble

damages, as well as attorney's fees pursuant to the MCA Agreements.

69.    On information and belief, under the terms of the MCA Agreements, YNS and Aly were receiving repayment for their loans through debits to Debtor's bank accounts. YNS and Aly were not responsible for collecting the Accounts Receivable and thus had not purchased the specified receivables but, instead, had made a loan.

70.    YNS required personal guaranties from Debtor's principals, again indicating that YNS had not assumed the same risk of loss as the Debtor, and reflecting that the transaction was a loan.

71.    By entering into the MCA Agreements, Debtor, YNS and Aly violated federal and state laws by selling unearned legal fees or funds that were supposed to be held in trust or used for the benefit of consumers.

72.    The effect of the MCA Agreements and/or related transactions was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

/ / /

73.     Because the MCA Agreements and/or related transactions violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the MCA Agreements and/or related transactions was unlawful.

74.     Moreover, even if the MCA Agreements were not void for being unlawful, Debtor received less than reasonable equivalent value in exchange for incurring the purported obligations. As such, Debtor's obligations under the MCA Agreements are avoidable as fraudulent transfers.

75.     On information and belief, YNS and Aly received funds from LPG accounts which may include funds flowing through and from Diab controlled entities including without limitation Maverick Management Group LLC, Prime Logix, LLC and BAT Inc. (d/b/a Coast Processing). As alleged above, on information and belief, the funds that Debtor used to pay YNS and Aly through LPG accounts and through its affiliate Vulcan consisted of Client Funds, ACH Receivables and/or other LPG funds.

76.     As a result, Debtor's payments to YNS and Aly pursuant to the MCA Agreements were fraudulent and must be set aside.

**H.      Blum's Involvement**

77.     Upon information and belief, Blum is a principal and agent of YNS and Aly.

78.     Upon information and belief, Blum solicited, arranged for, facilitated and/or participated in the above-described MCA Agreements and Transfers.

**I.      LPG's Ponzi Scheme**

79.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.

80.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.   The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of

1  the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future

2  investors will not be paid is sufficient to establish his actual intent to defraud them.  *Kirkland v. Rund*

3  *(In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is

4  destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership);

5  *cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties,*

6  *Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full

7  knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay

8  or defraud within the meaning of § 548(a)(1))."  *Merrill v. Abbott (In re Independent Clearing House*

9  *Co.)* (D. Utah 1987) 77 B.R. 843, 860.  A trustee in bankruptcy is not required to show that an operator

10  of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD Inv. Co.,*

11  *LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of

12  a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was

13  subjectively aware his Ponzi scheme was destined to fail.").

14       81.    "But if all the debtor receives in return for a transfer is the use of the defendant's

15  money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share.  In fact,

16  by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by

17  increasing the amount of claims while diminishing the debtor's estate.  In such a situation, the use of

18  the defendant's money cannot objectively be called 'reasonably equivalent value.'"  *In re Independent*

19  *Clearing House Co.* 77 B.R. at 859.  Therefore, "[t]he trustee can avoid the transfers if they were

20  preferential or fraudulent.  Transfers to investors in a Ponzi scheme are preferential and fraudulent.

21  Therefore, they constitute "property of the estate," and the trustee can recover them.  *Id.* at 853 n.17

22  (citations omitted).

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

82.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

83. Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

**J. LPG's Prepetition Creditors**

84. Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. Debtor's insolvency is an adjudicated fact based on the Court's finding of insolvency entered in other adversary proceedings pending before the Court. *See, e.g.*, Case No. 8:23-bk-10571-SC; Adv. No. 8:24-ap-01002-SC [Adv. Docket No. 28] (finding that "Debtor was insolvent or rendered insolvent at the time of the transfers made to Defendant").

85. Plaintiff directs Defendant to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was, in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidence before the Court that the Debtor was running a Ponzi scheme and paying some outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, l. 11-13; p. 4, l. 14-15. Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

86. When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly

1  secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to

2  Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on

3  or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC

4  purportedly secured by UCC statements filed on or about September 15, 2021, and December 1,

5  2021.[1]

6       87.    As alleged above, LPG was borrowing against its assets and future income, often on

7  unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the

8  marketing affiliates for providing consumer clients and to pay other loans to creditors that were in

9  default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as

10  possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other

11  entities under his control. Pursuant to the agreements with the marketing companies, significant

12  percentages of future payments were already promised to be paid to the marketing affiliates from

13  whatever future income the Debtor would receive. And, of course, the payments LPG received in the

14  form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return

15  of funds in the event of a request for refund or termination of the representation before LPG had

16  earned the funds. In this regard, except to the extent earned, the ACH Receivables also represented a

17  liability of the Debtor.

18       88.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11

19  unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured

20  creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic

21  Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of

22  Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State

23  Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

24  / / /

25  / / /

26  / / /

27  / / /

28
---
[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

89.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

90.     As of the date this complaint was drafted, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,462.29.

## FIRST CLAIM FOR RELIEF

### Count I - Avoidance, Recovery, and Preservation of

### Actual Two-Year Fraudulent Transfers Against Defendants YNS and Aly

### [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]

91.     Plaintiff realleges and incorporates here by reference each and every allegation contained in the preceding paragraphs as though set forth in full.

92.    The MCA Agreements and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

93.    On or after the date that any such agreements were entered or executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

94.    The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

95.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Aly and YNS sums received from consumers under such MCA Agreements. Any obligation of the Debtor arising from such agreements is avoidable as fraudulent.

96.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to sell or transfer portions of its accounts receivable to Defendants, which is illegal under federal and state laws.

97.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

98.    The Debtor was operating a Ponzi Scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

99.    The Defendants' conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Defendants and to punish the Defendants.

100.    The MCA Agreements and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

/ / /

/ / /

## SECOND CLAIM FOR RELIEF

### Count II - Avoidance, Recovery, and Preservation of

### Constructive Two-Year Fraudulent Transfers

### Against Defendants YNS and Aly

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

101.    Plaintiff realleges and incorporates here by reference each and every allegation contained in the preceding paragraphs as though set forth in full.

102.    The MCA Agreements and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

103.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

104.    The Transfers happened while Debtor:

    a.    was insolvent or became insolvent as a result;

    b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

105.    Because the MCA Agreements and Transfers are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

106.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to YNS and Aly because by using YNS's and Aly's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of YNS's and Aly's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

107.    Therefore, the Defendant was acting as an investor in the Debtor's Ponzi scheme. Any transfers made to the Defendant can be avoided by the Plaintiff since the Transfers are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

108.    The MCA Agreements and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### THIRD CLAIM FOR RELIEF

**Count III - Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfer(s) Against Defendants YNS and Aly**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

109.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

110.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid obligations of the Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(1) and 3439.05.

111.    All of the Transfers occurred within four years prior to the Petition Date.

112.    On or after the date that the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

113.    Despite Debtor's obligation to the Prepetition Creditors, the Transfers were made with funds that should have been delivered to the Debtor.

114.    The Transfers were made with the actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme and because the Transfers were made from Client Funds that were diverted from the Debtor.

115.    The Transfers were made with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

116.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not

1  and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition

2  Creditors.

3      117.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 544 and Cal. Civ.

4  Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims

5  against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that

6  were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the

7  Prepetition Creditors.

8      118.    As avoidable transfers pursuant to 11 U.S.C. § 544, the Transfers, or the value thereof,

9  should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

10                          **FOURTH CLAIM FOR RELIEF**

11  **Count IV - Avoidance, Preservation, and Recovery of Constructive Four-Year Fraudulent**

12                  **Transfer(s) Against Defendants YNS and Aly**

13      **[11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07]**

14      119.    Plaintiff realleges and incorporates by reference each and every allegation contained

15  in the preceding paragraphs as though set forth in full herein.

16      120.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor

17  which are voidable under applicable law by an unsecured creditor of Debtor, including under

18  California Civil Code §§ 3439.04(a)(2) and 3439.05.

19      121.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

20      122.    The Transfers were made at a time when Debtor was insolvent and/or rendered

21  insolvent by virtue of said transfers.

22      123.    At the time each Transfer was made, Debtor was engaged or was about to engage in a

23  business or a transaction for which the remaining assets of Debtor were unreasonably small in relation

24  to the business or transaction.

25      124.    At the time each Transfer was made, Debtor intended to incur, or believed or

26  reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as

27  they became due.

28  / / /

                                    23

125.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

126.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

127.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

128.    Each Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned.

129.    Each Defendant knew or should have known that the funds used to make the Transfers were Client Funds that were diverted from the Debtor or were the proceeds of "selling" payments from client files to non-lawyers.

130.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

131.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

## FIFTH CLAIM FOR RELIEF

### Count V - Turnover of Estate Property Against Defendants YNS and Aly

### [11 U.S.C. § 542]

132.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as though set forth in full.

133.    Defendants Aly and YNS have possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

134.    The Transfers are not of inconsequential value to the Estate.

135.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

136.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers pursuant to 11 U.S.C. § 542.

## SIXTH CLAIM FOR RELIEF

### Count VI - Aiding and Abetting Against Defendant Blum

### [11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]

137.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as though set forth in full.

138.    Plaintiff alleges that Blum is liable to the Debtor as he aided and abetted in the making of the fraudulent and/or voidable MCA Agreements and Transfers.

139.    Blum, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

140.    Blum, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

141.    Blum, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of the fraudulent and criminal activity related to the Ponzi scheme.

142.    Upon information and belief, Blum knew that the Debtor was a law firm who was obligated to escrow Client Funds until earned pursuant to applicable law.

143.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

144.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Blum's unlawful activities.

/ / /

/ / /

/ / /

/ / /

# **RESERVATION OF RIGHTS**

145.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**<u>PRAYER FOR RELIEF</u>**

2

**WHEREFORE**, Plaintiff prays for a judgment as follows:

3

**On The First, Second, Third, and Fourth Claims for Relief:**

4

1.  Avoiding, recovering, and preserving the Transfers against Defendants;

5

**On The First and Third Claims for Relief:**

6

2.  Awarding punitive and exemplary damages according to proof;

7

**On the Fifth Claim for Relief:**

8

3.  Ordering Defendants to immediately turn over the Transfers;

9

**On the Sixth Claim for Relief:**

10

4.  Awarding Plaintiff compensatory damages in an amount to be determined at trial;

11

**On All Claims for Relief:**

12

5.  Awarding costs of suit;

13

6.  Awarding punitive damages;

14

7.  Awarding attorneys' fees;

15

8.  Awarding pre-judgment interest at the maximum legal rate running from the date of

16

the Complaint to the date of judgment herein;

17

9.  Awarding post-judgment interest at the maximum legal rate running from the date of

18

judgment herein until the date the judgment is paid in full, plus costs;

19

10. Requiring YNS, Aly, and Blum to pay forthwith any judgment awarded herein; and

20

11. Granting Plaintiff such other and further relief as the Court deems just and proper.

21

Respectfully submitted,

22

Dated:  March 18, 2025                                      DINSMORE & SHOHL LLP

23

24

By:   */s/ Christopher B. Ghio*
Christopher B. Ghio

25

M. Trent Spurlock
Suzanne M. Marino

26

Attorneys for Richard A. Marshack,

27

Trustee of the LPG Liquidation Trust

28

Exhibit 1

EXHIBIT 1
Page 28

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele: 619.400.0500
   Fax: 619.400.0501
7
8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
   101 S. Fifth Street, Suite 2500
10 Louisville, Kentucky 40202
   Tele: 859-425-1096
11 Fax: 502-585-2207
12 (Admitted pro hac vice)

13 Special Counsel to Richard A. Marshack

14                **UNITED STATES BANKRUPTCY COURT**

15       **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 In Re                              Case No: 23-bk-10571-SC

17                                    Chapter 11

18                                    **ORDER GRANTING MOTION FOR
   The Litigation Practice Group P.C.,  ENTRY OF PROTECTIVE ORDER AND
19                                    THE PROTECTIVE ORDER**
                Debtor(s),
20

21                                    Date:    May 23, 2024
                                      Time:    1:30 p.m.
22                                    Judge:   Hon. Scott C. Clarkson
                                      Place:   Courtroom 5C (via Zoom)[1]
23                                             411 West Fourth Street
                                               Santa Ana, CA 92701
24

25

26

27 ─────────────────────
   [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28 publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

EXHIBIT 1
Page 29

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.      DEFINITIONS**

1.1      "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2      This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3      "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4      "Receiving Party" means a Party that receives Confidential Information during the Action.

2

EXHIBIT 1

1    1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2    **2.    SCOPE OF THIS PROTECTIVE ORDER**

3    2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and

4    other products of discovery obtained in the Action from the Parties there to, and from third parties.

5    As well as certain information copied or derived therefrom, excerpts, summaries or compilations

6    thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement

7    discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal

8    Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure,

9    answers to interrogatories, deposition transcripts, responses to requests for production, responses to

10   requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material

11   and information as may be produced during the course of the Action and designated as Confidential

12   Information.

13   **3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

14   3.1    This Protective Order shall govern the production and handling of any Confidential

15   Information in this Action. Any Party or non-party who produces Confidential Information in this

16   Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this

17   Protective Order. Whenever possible, the Designating Party must designate only those portions of a

18   document, written discovery responses, deposition, transcript, or other material that contain the

19   Confidential Information and refrain from designating entire documents. Regardless of any

20   designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure

21   of its Confidential Information outside of this Action or for any business purposes. In addition, any

22   Party may move to modify or seek other relief from any of the terms of this Protective Order if it has

23   first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party

24   as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order

25   shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure

26   and utilizing the documents as needed through-out the Action.

27   3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or

28   materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

EXHIBIT 1
Page 31

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

## 4.    CHALLENGES TO DESIGNATED INFORMATION

4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

1   resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2   under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3   constitute a concession that the designation is proper or an admission that the designated information

4   is otherwise competent, relevant, or material.

5        **5.**       **LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6        5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7   and designated under this Protective Order may be used for preparation for trial and preparation for

8   any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9   other purpose, without the written consent of the Designating Party. No Confidential Information may

10  be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11  parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12  Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13  of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14  not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15  any subpoena that seeks production or disclosure of any designated information and consulting with

16  the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17  Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18  disclosing person or party to sanctions.

19       5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20  Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21  reviewed by the following:

22       a)      The Court, its personnel, and court reporters;

23       b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a

24  joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25  in the Action and are informed of the duties and obligations imposed hereunder;

26       c)      The Parties, including their clients, agents and employees who are assisting or have

27  reason to know of the Action;

28  / / /

EXHIBIT 1
Page 33

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3     <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4     <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5     <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this

Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to

the admissibility at trial of any evidentiary materials.

**6.**     **CLAW-BACK REQUESTS**

6.1     <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it

produced or disclosed Confidential Information without designation, it may promptly notify the

Receiving Party and identify with particularity the Confidential Information to be designated and the

level of designation (the claw-back notification). The Receiving Party may then request substitute

production of the newly-designated information. Within thirty (30) days of receiving the claw-back

notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked

or, if substitute production has been requested, destroyed all unmarked copies that it received, made,

and/or distributed; and (2) if it was practicably unable to mark or destroy any information because

disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms

of this Protective Order regarding that information, the Receiving Party must reasonably provide as

much information as practicable to aid the Designating Party in protecting the information,

consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation

privileges.

6.2     <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers

that it produced information that it reasonably believes is subject to protection under the

attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each

Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and

comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute

information that redacts the information subject to the claimed protection. The Receiving Party must

thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed

protection.

/ / /

/ / /

/ / /

7

EXHIBIT 1
Page 35

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

EXHIBIT 1
Page 36

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

9

EXHIBIT 1
Page 37

1

2

3

4

5

6

EXHIBIT "A"

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re | Case No. 8:23-BK-10571-SC |
| | Chapter 11 |
| The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED ORDER** |
| Debtor(s), | Date:   May 23, 2024 |
| | Time:   1:30 p.m. |
| | Judge:  Hon. Scott C. Clarkson |
| | Place:  Courtroom 5C[1] - Via Zoom |
| | 411 W. Fourth Street |
| | Santa Ana, CA  92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

1

1   This is to certify that:

2        (a)    I am being given access to Confidential Information pursuant to the

3   Stipulated Protective Order that was entered into the main bankruptcy case for

4   Litigation Practice Group, but which is binding and controlling as set forth by the

5   Court's Order on any and all contested matters and  any and all litigation commenced

6   by Trustee;

7        (b)    I have read the Stipulated Protective Order; and

8        (c)    I agree to be bound by the terms and conditions thereof, including,

9   without limitation, to the obligations regarding the use, non-disclosure and return of

10  such Confidential Information. I further agree that in addition to being contractually

11  bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12  reference Court for any violation thereof.

13

14  Date: _____

15

16                                          _____
                                                         Signature

17

18                                          _____
19                                                     Printed Name

20

21

22

23

24

25

26

27

28

Exhibit 2

EXHIBIT 2
Page 41

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (30/20/2019 – 03/20/2023)

**Aly Management LLC**

| Bank Name | Account Name | Statement Date | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/3/2022 | 125,000.00 | Book Tranafer Debit NC: Aly Management LLC Brooklyn NY 11219-5198 US Tm: 7672500307Jo |
| | | | | **125,000.00** | |

EXHIBIT 2
Page 42

Exhibit 3

EXHIBIT 3
Page 43

**YNS FUNDING LLC**
35 WEST 9TH STREET, BROOKLYN, NY 11231
(718) 705-4214

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated Nov. 07, 2022 by and between YNS FUNDING LLC ("YNS") and each merchant listed below ("Merchant").

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC
D/B/A/: THE LITIGATION PRACTICE GROUP                      Fed ID #: 83-3885343
Type of Entity: Corporation
Business Address: 17542 17TH ST          City: TUSTIN          State: CA          Zip: 92780
Contact Address: 20160 NOB HILL DR       City: YORBA LINDA    State: CA          Zip: 92886
E-mail Address: Admin@litigationpracticegroup.com      Phone Number: (949) 715-0648

| | |
|---|---:|
| **Purchase Price** *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | **$ 500,000.00** |
| **Receivables Purchased Amount** *This is the amount of Receivables (defined in Section 1 below) being sold.* | **$ 749,500.00** |
| **Specified Percentage** *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | **25.00%** |
| **Net Funds Provided** *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | **$ 500,000.00** |
| **Initial Estimated Payment** *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | **$ 12,491.67** **per day** |

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to YNS (making YNS the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to YNS. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by YNS, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of YNS and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for YNS and that each Merchant will hold Receivables in trust for YNS in its capacity as a fiduciary for YNS.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*Daniel Stephen March*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH      Date:  11/7/2022

EXHIBIT 3
Page 44

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

The Receivables Purchased Amount shall be paid to YNS by each Merchant irrevocably authorizing only one depositing account acceptable to YNS (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as YNS receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes YNS to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide YNS with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). YNS is not responsible for any overdrafts or rejected transactions that may result from YNS's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to YNS for the following fees, where applicable:

A. $0.00 - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If YNS considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover YNS filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of YNS's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that YNS will collect from Merchant(s) towards the Receivables Purchased Amount during any specific day will be capped at $12,491.67 (the "Cap"). If the Specified Percentage of all Receivables for a specific day is less than the Cap, then in addition to the Specified Percentage of Receivables for that day, YNS will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that day does not exceed the Cap. The Cap is not applicable to make up for a business day on which YNS is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by YNS to have taken place.

**4. Reconciliations**. Any Merchant may give written notice to YNS requesting that YNS conduct a reconciliation in order to ensure that the amount that YNS has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@ynsfunding.com and such notice will be deemed to have been received if and when YNS sends a reply e-mail (but not a read receipt). If such reconciliation determines that YNS collected more than it was entitled to, then YNS will credit to the Account all amounts to which YNS was not entitled within seven days thereafter. If such reconciliation determines that YNS collected less than it was entitled to, then YNS will debit from the Account all additional amounts to which YNS was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. YNS will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying YNS the amount of the balance of the Receivables Purchased Amount at that time.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/7/2022

EXHIBIT 3

Page 45

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to YNS, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide YNS and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize YNS and/or its agent(s) to deduct the amounts owed to YNS for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to YNS by permitting YNS to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent YNS's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until YNS receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to YNS under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes YNS and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to YNS any bank or financial statements, tax returns, and other documents and records, as YNS deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. YNS is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** YNS may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between YNS and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for YNS to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

YNS may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives YNS permission to call or send a text message to any telephone number given to YNS in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives YNS permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that YNS will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that YNS has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of YNS's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. YNS may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to YNS. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize YNS, its agents and representatives, and any credit-reporting agency engaged by YNS, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/7/2022

EXHIBIT 3

DocuSign Envelope ID: FBA318CD-13B5-1322-B2F9-F8BB06BBB113

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to YNS under this Agreement or for YNS's ability to determine any Merchant's eligibility to enter into any future agreement with YNS. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to YNS under the Fair Credit Reporting Act, authorizing YNS to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes YNS to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to YNS under the Fair Credit Reporting Act, authorizing YNS to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes YNS to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide YNS with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by YNS for monies owed to YNS from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by YNS.

**14. No Liability.** In no event will YNS be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and YNS agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from YNS to any Merchant. YNS is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in YNS not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. YNS has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to YNS in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints YNS as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to YNS, or, if YNS considers an Event of Default to have taken place under Section 34, to settle all obligations due to YNS from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to YNS; and (v) to file any claims or take any action or institute any proceeding which YNS may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by YNS, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/7/2022

EXHIBIT 3
Page 47

<u>**STANDARD MERCHANT CASH ADVANCE AGREEMENT**</u>

by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to YNS;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of YNS and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to YNS; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to YNS at law, in equity, or otherwise available pursuant to this Agreement.

(f) YNS considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. YNS may enforce the provisions of the Guarantee against Guarantor.

Protection 3. YNS may enforce its security interest in the Collateral identified in Section 33.

Protection 4. YNS may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by YNS, Merchant shall deliver to YNS an executed assignment of lease of each Merchant's premises in favor of YNS. Upon breach of any provision in this Section 17, YNS may exercise its rights under such assignment of lease.

Protection 6. YNS may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. YNS will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to YNS of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to YNS an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints YNS and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to YNS as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes YNS to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against YNS or any of its affiliates relating to any (i) investigation undertaken by or on behalf of YNS as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by YNS, including this Agreement and any other YNS documents (collectively, "Confidential Information") are proprietary and confidential information of YNS. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of YNS to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that YNS may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between YNS and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH       Date:  11/7/2022

EXHIBIT 3

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to YNS, and future statements which will be furnished hereafter at the request of YNS, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise YNS of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming YNS as loss payee and additional insured in amounts and against risks as are satisfactory to YNS and shall provide YNS proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without YNS's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to YNS or change any place(s) of its business without prior written consent from YNS.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from YNS to that Merchant, execute, acknowledge, and deliver to YNS and/or to any other person or entity specified by YNS, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of YNS, other than any for which YNS has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than YNS any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of YNS.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH     Date:  11/7/2022

EXHIBIT 3

Page 49

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to YNS under this Agreement and any future agreement with YNS, each Merchant hereby grants to YNS a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to YNS under any other agreement between any Merchant or Guarantor and YNS (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as YNS deems necessary to perfect or maintain YNS's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes YNS to file any financing statements deemed necessary by YNS to perfect or maintain YNS's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to YNS with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with YNS's rights. Each Merchant shall be liable for and YNS may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by YNS in protecting, preserving, and enforcing YNS's security interest and rights. Each Merchant further acknowledges that YNS may use another legal name and/or D/B/A or an agent when designating the Secured Party when YNS files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with YNS that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide YNS with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of YNS other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of YNS;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of YNS;
(8) Any Merchant uses multiple depository accounts without the prior written consent of YNS;
(9) Any Merchant changes the Account without the prior written consent of YNS;
(10) YNS is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by YNS;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;
(14) Any Merchant causes any ACH debit to the Account by YNS to be blocked or stopped without providing any

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date: 11/7/2022

EXHIBIT 3

Page 50

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

advance written notice to YNS, which notice may be given by e-mail to info@ynsfunding.com; or

(15) Any Merchant prevents YNS from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide YNS with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to info@ynsfunding.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with YNS.

**35. Remedies.** In case any Event of Default occurs and is not waived, YNS may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of YNS in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by YNS after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, YNS will be entitled to the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without YNS being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give YNS written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give YNS at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of YNS, which consent may be withheld in YNS's sole discretion. YNS may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by YNS, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or YNS) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between YNS and such assignee (the "Assignment Agreement"), have the rights and obligations of YNS under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, YNS's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, YNS may disclose all information that YNS has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon YNS's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by info@ynsfunding.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5603A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/7/2022

EXHIBIT 3

DocuSign Envelope ID: FBA318CD-13B5-4322-B2F9-F8BB06BFB113

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by YNS in the State of New York, that the Receivables Purchased Amount is being delivered to YNS in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between YNS, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving YNS on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to YNS may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by YNS, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against YNS within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of YNS's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If YNS becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then YNS will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If YNS prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay YNS's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** YNS, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving YNS on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH      Date: 11/7/2022

EXHIBIT 3
Page 52

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to YNS making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of YNS.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to YNS by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by YNS demonstrating that YNS was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of YNS to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to YNS by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of YNS. Each Merchant and each Guarantor acknowledge that YNS is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify YNS and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that YNS does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH      Date:  11/7/2022

EXHIBIT 3

Page 53

DocuSign Envelope ID: FBA318CD-13F5-4322-B2F9-F8BB06BFB113

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**53.  Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54.  Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any  provision  of  this  Agreement  is  deemed  void,  all  other  provisions  will  remain  in  effect.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC601A23474

Name and Title: DANIEL STEPHEN MARCH      Date:  11/7/2022

EXHIBIT 3

Page 54

DocuSign Envelope ID: FBA318CD-13E5-4322-B2F9-F8BB06BFB113

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. YNS will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

## EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: DANIEL STEPHEN MARCH
      (Print Name and Title)

DocuSigned by:
*DANIEL STEPHEN MARCH*
242CC56DC93442A (Signature)

SS# 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

Driver License Number  N2546065

**FOR THE MERCHANT/OWNER (#2)**

By:
      (Print Name and Title)

(Signature)

SS#

Driver License Number

Approved for YNS FUNDING LLC by: {!loan-approved-by}

EXHIBIT 3
Page 55

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated Nov. 07, 2022, of the Standard Merchant Cash Advance Agreement, dated Nov. 07, 2022 ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between YNS FUNDING LLC ("YNS") and THE LITIGATION PRACTICE GROUP PC ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to YNS in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** YNS may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives YNS permission to call or send a text message to any telephone number given to YNS in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives YNS permission to communicate such information to them by e-mail. Each Guarantor agrees that YNS will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that YNS has no liability for any such charges.

**G3. Guarantor Waivers.** If YNS considers any Event of Default to have taken place under the Agreement, then YNS may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral YNS may hold pursuant to this Guarantee or any other agreement or guarantee. YNS does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) YNS's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to YNS. In addition, YNS may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to YNS; (ii) if there is more than one Merchant, release a Merchant from its obligations to YNS such that at least one Merchant remains obligated to YNS; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to YNS under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, YNS will be entitled to the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default,

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date: 11/7/2022

EXHIBIT 3

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without YNS being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by YNS in the State of New York, that the Receivables Purchased Amount is being delivered to YNS in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between YNS, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving YNS on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to YNS may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with YNS.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by YNS, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against YNS within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of YNS's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If YNS becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then YNS will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If YNS prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay YNS's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** YNS, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving YNS on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of

**I have read and agree to the terms and conditions set forth above:**

DANIEL STEPHEN MARCH

Name and Title: DANIEL STEPHEN MARCH    Date:  11/7/2022

EXHIBIT 3

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to YNS making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of YNS.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to YNS by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by YNS demonstrating that YNS was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date: 11/7/2022

EXHIBIT 3

Page 58

DocuSign Envelope ID: FBA318CD-13E5-4322-B2F9-F8BB06BEB113

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC601A23474

Name and Title: DANIEL STEPHEN MARCH      Date:  11/7/2022

EXHIBIT 3

DocuSign Envelope ID: FBA318CD-13E5-4322-B2F9-F8BB06BFB113

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

**GUARANTOR (#1)**

By: DANIEL STEPHEN MARCH
         (Print Name)

DocuSigned by:

DANIEL STEPHEN MARCH
242CC5601A23474...    (Signature)

SS# 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                                    Driver License Number  N2546065

**GUARANTOR (#2)**

By:
         (Print Name)                                    (Signature)

SS#                                    Driver License Number

EXHIBIT 3
Page 60

<u>**STANDARD MERCHANT CASH ADVANCE AGREEMENT**</u>

# <u>BANK INFORMATION</u>

Dear Merchant,

     Thank you for accepting this offer from YNS FUNDING LLC. We look forward to being your funding partner. You authorize YNS FUNDING LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below. YNS FUNDING LLC will require viewing access to your bank account each business day. YNS FUNDING LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process. Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank:  `Chase`

Name of account:  `Litigation Practice Group`

Routing number: 122242843

Account number: 065293441

Bank portal website:  `www.chase.com`

Username:  `adminlpg`

Password:  `Litigation1!`

Security Question/Answer 1:  `n/a`

Security Question/Answer 2:  `n/a`

Security Question/Answer 3:  `n/a`

Any other information necessary to access your account:

 `Code sent to phone number ending 0648`

     If you have any questions please feel free to contact us directly at (718) 705-4214.

EXHIBIT 3

Page 61

**<u>STANDARD MERCHANT CASH ADVANCE AGREEMENT</u>**

# <u>Emergency Contacts</u>

**4 valid emergency contacts are required to receive funding. Contacts will be verified.**


**Name:** Bruce Pearl

**Relation:** Friend

**Phone Number:** 949-785-7877

**Email Address:** bruce1##@gmail.com


**Name:** Rosa Viera

**Relation:** Secretary

**Phone Number:** 714-466-5329

**Email Address:** rosav@lpglaw.com


**Name:** Carl Wetherell

**Relation:** Colleage

**Phone Number:** 415-812-3131

**Email Address:** carl@lpglaw.com


**Name:** Vincent Demarco

**Relation:** Friend

**Phone Number:** 316-665-4142

**Email Address:** vinnyd1977@yahoo.com

EXHIBIT 3

Page 62

# Exhibit 4

EXHIBIT 4

Page 63

**YNS FUNDING LLC**
35 WEST 9TH STREET, BROOKLYN, NY 11231
(718) 705-4214

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated Nov. 22, 2022 by and between YNS FUNDING LLC ("YNS") and each merchant listed below ("Merchant").

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC

D/B/A/: THE LITIGATION PRACTICE GROUP                    Fed ID #: 83-3885343

Type of Entity: Corporation

Business Address: 17542 17TH ST          City: TUSTIN          State: CA          Zip: 92780

Contact Address: 20160 NOB HILL DR          City: YORBA LINDA          State: CA          Zip: 92886

E-mail Address: Admin@litigationpracticegroup.com          Phone Number: (949) 715-0648

| | |
|---|---:|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | **$ 1,100,000.00** |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | **$ 1,648,900.00** |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | **25.00%** |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | **$ 1,100,000.00** |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | **$ 32,978.00**<br><br>**per day** |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to YNS (making YNS the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to YNS. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by YNS, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of YNS and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for YNS and that each Merchant will hold Receivables in trust for YNS in its capacity as a fiduciary for YNS.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH          Date:  11/22/2022

EXHIBIT 4

Page 64

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

The Receivables Purchased Amount shall be paid to YNS by each Merchant irrevocably authorizing only one depositing account acceptable to YNS (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as YNS receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes YNS to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide YNS with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). YNS is not responsible for any overdrafts or rejected transactions that may result from YNS's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to YNS for the following fees, where applicable:

A. $0.00 - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If YNS considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover YNS filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of YNS's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that YNS will collect from Merchant(s) towards the Receivables Purchased Amount during any specific day will be capped at $32,978.00 (the "Cap"). If the Specified Percentage of all Receivables for a specific day is less than the Cap, then in addition to the Specified Percentage of Receivables for that day, YNS will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that day does not exceed the Cap. The Cap is not applicable to make up for a business day on which YNS is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by YNS to have taken place.

**4. Reconciliations**. Any Merchant may give written notice to YNS requesting that YNS conduct a reconciliation in order to ensure that the amount that YNS has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@ynsfunding.com and such notice will be deemed to have been received if and when YNS sends a reply e-mail (but not a read receipt). If such reconciliation determines that YNS collected more than it was entitled to, then YNS will credit to the Account all amounts to which YNS was not entitled within seven days thereafter. If such reconciliation determines that YNS collected less than it was entitled to, then YNS will debit from the Account all additional amounts to which YNS was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. YNS will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying YNS the amount of the balance of the Receivables Purchased Amount at that time.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/22/2022

EXHIBIT 4

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to YNS, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide YNS and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize YNS and/or its agent(s) to deduct the amounts owed to YNS for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to YNS by permitting YNS to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent YNS's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until YNS receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to YNS under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes YNS and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to YNS any bank or financial statements, tax returns, and other documents and records, as YNS deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. YNS is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** YNS may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between YNS and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for YNS to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

YNS may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives YNS permission to call or send a text message to any telephone number given to YNS in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives YNS permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that YNS will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that YNS has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of YNS's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. YNS may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to YNS. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize YNS, its agents and representatives, and any credit-reporting agency engaged by YNS, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH     Date: 11/22/2022

EXHIBIT 4

DocuSign Envelope ID: 3271CE88-876D-44B-AA20-9713B510BA8C

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to YNS under this Agreement or for YNS's ability to determine any Merchant's eligibility to enter into any future agreement with YNS. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to YNS under the Fair Credit Reporting Act, authorizing YNS to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes YNS to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to YNS under the Fair Credit Reporting Act, authorizing YNS to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes YNS to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide YNS with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by YNS for monies owed to YNS from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by YNS.

**14. No Liability.** In no event will YNS be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and YNS agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from YNS to any Merchant. YNS is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in YNS not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. YNS has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to YNS in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints YNS as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to YNS, or, if YNS considers an Event of Default to have taken place under Section 34, to settle all obligations due to YNS from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to YNS; and (v) to file any claims or take any action or institute any proceeding which YNS may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by YNS, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH      Date:  11/22/2022

EXHIBIT 4
Page 67

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to YNS;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of YNS and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to YNS; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to YNS at law, in equity, or otherwise available pursuant to this Agreement.

(f) YNS considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. YNS may enforce the provisions of the Guarantee against Guarantor.

Protection 3. YNS may enforce its security interest in the Collateral identified in Section 33.

Protection 4. YNS may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by YNS, Merchant shall deliver to YNS an executed assignment of lease of each Merchant's premises in favor of YNS. Upon breach of any provision in this Section 17, YNS may exercise its rights under such assignment of lease.

Protection 6. YNS may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. YNS will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to YNS of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to YNS an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints YNS and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to YNS as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes YNS to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against YNS or any of its affiliates relating to any (i) investigation undertaken by or on behalf of YNS as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by YNS, including this Agreement and any other YNS documents (collectively, "Confidential Information") are proprietary and confidential information of YNS. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of YNS to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that YNS may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between YNS and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A234Z4

Name and Title: DANIEL STEPHEN MARCH    Date: 11/22/2022

EXHIBIT 4
Page 68

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to YNS, and future statements which will be furnished hereafter at the request of YNS, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise YNS of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming YNS as loss payee and additional insured in amounts and against risks as are satisfactory to YNS and shall provide YNS proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without YNS's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to YNS or change any place(s) of its business without prior written consent from YNS.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from YNS to that Merchant, execute, acknowledge, and deliver to YNS and/or to any other person or entity specified by YNS, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of YNS, other than any for which YNS has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than YNS any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of YNS.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date: 11/22/2022

EXHIBIT 4
Page 69

DocuSign Envelope ID: 3271CC88-876D-44B-AA20-9713B510BA8C

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to YNS under this Agreement and any future agreement with YNS, each Merchant hereby grants to YNS a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to YNS under any other agreement between any Merchant or Guarantor and YNS (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as YNS deems necessary to perfect or maintain YNS's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes YNS to file any financing statements deemed necessary by YNS to perfect or maintain YNS's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to YNS with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with YNS's rights. Each Merchant shall be liable for and YNS may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by YNS in protecting, preserving, and enforcing YNS's security interest and rights. Each Merchant further acknowledges that YNS may use another legal name and/or D/B/A or an agent when designating the Secured Party when YNS files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with YNS that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide YNS with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of YNS other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of YNS;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of YNS;
(8) Any Merchant uses multiple depository accounts without the prior written consent of YNS;
(9) Any Merchant changes the Account without the prior written consent of YNS;
(10) YNS is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by YNS;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;
(14) Any Merchant causes any ACH debit to the Account by YNS to be blocked or stopped without providing any

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A73474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/22/2022

EXHIBIT 4

DocuSign Envelope ID: 3271CE88-876D-44B-AA29-9713B510BA8C

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

advance written notice to YNS, which notice may be given by e-mail to info@ynsfunding.com; or

 (15) Any Merchant prevents YNS from collecting any part of the Receivables Purchased Amount;

 (16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide YNS with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to info@ynsfunding.com; or

 (17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with YNS.

 **35. Remedies.** In case any Event of Default occurs and is not waived, YNS may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of YNS in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by YNS after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, YNS will be entitled to the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without YNS being required to furnish a bond or other undertaking in connection with the application.

 **36. Required Notifications.** Each Merchant is required to give YNS written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give YNS at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

 **37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of YNS, which consent may be withheld in YNS's sole discretion. YNS may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by YNS, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or YNS) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between YNS and such assignee (the "Assignment Agreement"), have the rights and obligations of YNS under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, YNS's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, YNS may disclose all information that YNS has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon YNS's request.

 **38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by info@ynsfunding.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**I have read and agree to the terms and conditions set forth above:**

*DocuSigned by:*

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH Date:  11/22/2022

EXHIBIT 4

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by YNS in the State of New York, that the Receivables Purchased Amount is being delivered to YNS in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between YNS, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving YNS on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to YNS may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by YNS, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against YNS within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of YNS's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If YNS becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then YNS will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If YNS prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay YNS's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** YNS, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving YNS on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A234747

Name and Title: DANIEL STEPHEN MARCH    Date: 11/22/2022

EXHIBIT 4

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to YNS making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of YNS.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to YNS by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by YNS demonstrating that YNS was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of YNS to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to YNS by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of YNS. Each Merchant and each Guarantor acknowledge that YNS is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify YNS and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that YNS does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A234744

Name and Title: DANIEL STEPHEN MARCH    Date: 11/22/2022

EXHIBIT 4

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date: 11/22/2022

EXHIBIT 4
Page 74

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. YNS will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: DANIEL STEPHEN MARCH
      (Print Name and Title)

DocuSigned by:
*DANIEL STEPHEN MARCH*
242CC56DC53D74...
      (Signature)

SS# 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

Driver License Number   N2546065

**FOR THE MERCHANT/OWNER (#2)**

By:
      (Print Name and Title)

      (Signature)

SS#

Driver License Number

Approved for YNS FUNDING LLC by: {!loan-approved-by}

EXHIBIT 4
Page 75

DocuSign Envelope ID: 3271CC88-87FD-44B-AA20-9713B510BA8C

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated Nov. 22, 2022, of the Standard Merchant Cash Advance Agreement, dated Nov. 22, 2022 ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between YNS FUNDING LLC ("YNS") and THE LITIGATION PRACTICE GROUP PC ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to YNS in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** YNS may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives YNS permission to call or send a text message to any telephone number given to YNS in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives YNS permission to communicate such information to them by e-mail. Each Guarantor agrees that YNS will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that YNS has no liability for any such charges.

**G3. Guarantor Waivers.** If YNS considers any Event of Default to have taken place under the Agreement, then YNS may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral YNS may hold pursuant to this Guarantee or any other agreement or guarantee. YNS does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) YNS's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to YNS. In addition, YNS may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to YNS; (ii) if there is more than one Merchant, release a Merchant from its obligations to YNS such that at least one Merchant remains obligated to YNS; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to YNS under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, YNS will be entitled to the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default,

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/22/2022

EXHIBIT 4
Page 76

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without YNS being required to furnish a bond or other undertaking in connection with the application.

**G6.  Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by YNS in the State of New York, that the Receivables Purchased Amount is being delivered to YNS in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between YNS, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving YNS on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to YNS may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with YNS.

**G9.  Counterclaim  Waiver.** In any litigation or arbitration commenced by YNS, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against YNS within one year of its accrual will be time barred.

**G11.  Costs.** Each Merchant and each Guarantor must pay all of YNS's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If YNS becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then YNS will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If YNS prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay YNS's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** YNS, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving YNS on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date:  11/22/2022

EXHIBIT 4

Page 77

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to YNS making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in YNS's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to YNS as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of YNS.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to YNS by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by YNS demonstrating that YNS was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH    Date: 11/22/2022

EXHIBIT 4

Page 78

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474

Name and Title: DANIEL STEPHEN MARCH      Date: 11/22/2022

EXHIBIT 4

Page 79

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

**GUARANTOR (#1)**

By: DANIEL STEPHEN MARCH
(Print Name)

DocuSigned by:

*DANIEL STEPHEN MARCH*
242CC5601A23474...    (Signature)

SS# 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

Driver License Number  N2546065

**GUARANTOR (#2)**

By:
(Print Name)

(Signature)

SS#

Driver License Number

EXHIBIT 4
Page 80

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from YNS FUNDING LLC. We look forward to being your funding partner. You authorize YNS FUNDING LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below. YNS FUNDING LLC will require viewing access to your bank account each business day. YNS FUNDING LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process. Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank:  `Chase`

Name of account:  `Litigation Practice Group PC`

Routing number: 122242843

Account number: 065293441

Bank portal website:  `www.chase.com`

Username:  `adminlpg`

Password:  `Litigation1!`

Security Question/Answer 1:  `n/a`

Security Question/Answer 2:  `n/a`

Security Question/Answer 3:  `n/a`

Any other information necessary to access your account:

`Code sent to number 0468`

If you have any questions please feel free to contact us directly at (718) 705-4214.

EXHIBIT 4

Page 81

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

# Emergency Contacts

**4 valid emergency contacts are required to receive funding. Contacts will be verified.**


**Name:**  Rebecca McClinton

**Relation:**  Friend

**Phone Number:**  714-554-2681

**Email Address:**  rebeccmcc1977@gmail.com


**Name:**  Ken Brody

**Relation:**  Colleague

**Phone Number:**  949-811-4277

**Email Address:**  ken@lpglaw.com


**Name:**  Corey Wheelans

**Relation:**  Friend

**Phone Number:**  615-447-8065

**Email Address:**  kiwi-wheelans@gmail.com


**Name:**  James Hinson

**Relation:**  Secretary

**Phone Number:**  714-487-2216

**Email Address:**  dean@lpglaw.com

EXHIBIT 4

Page 82

# Exhibit 5

EXHIBIT 5
Page 83

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (30/20/2019 – 03/20/2023)

**YNS Funding LLC**

| Bank Name | Account Name | Statement Date | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/4/2022 | 400,000.00 | Fedwire Debit Vie: Optimumbank FLJ067015096 NC: Ync Funding LLC Brooklyn, NY 11219  US Ret: Lead Generation Imad: 1104B1Ogo08C045315 Tm: 6558800308Jo |
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/14/2022 | 525,000.00 | Fedwire Debit Via: Cptmniumbank FLJ067015096 NC: Yns Funding LLC US Ret: Lead  Purchase Imad: ii l4BIQgc0700l6688 Tm: 8248100314J0 |
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/14/2022 | 12,491.67 | Crig CC Nsme:Yns Funding LLC Crig ID:873572823 Deso Date:Nov 14CC Entry Dosor.Ynl  154 Thoeoo.CCD Tracoll.067015097463072 Eod:221 114 nd ID:Vnl 154 The Liti mdNamo:Ynl 154 The Litigation Tm: 3187483072Tc |
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/15/2022 | 12,491.67 | Orig CO NemeYna Pending [[C Orig 10873672823 Deco Date:Nov 1500 Entry Deacr.Ynl  154 ThesecCOD Tracell.0670t5090296297 Eed:221 115 md ID:Ynl 154 The Liti mdName:Ynl 154 The Litigation Tm: 3190296297Tc |
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/15/2022 | 12,491.67 | Orig CO NameYna Fending [[C Orig 1a873572823 Deco Date:Nov 1500 Entry Deecr.Ynl 154 Thesec.CCD Trace#.067015090296295 Eed:221 115 md ID Ynl 154 The Liti md Name:Ynl 154 The Litigation Tm 3190295295Tc |
| Chase | The Litigation Practice Group PC | 11/30/2022 | 11/16/2022 | 12,491.67 | Orig CO Name Ync Pending [[C Orig ID 873872823 Deco Date: Nov 16 00 Entry Decor  Yn1154 Theaec COD TraceS 067015091516485 Eed:221115 md ID:Ynl 154 The Liti md  Name:Ynl 154 The Litigation Tm: 32016164B5Tc |
| Bank of America | Vulcan Consulting Group LLC dba DRD | 11/30/2022 | 11/18/2022 | 535,000.00 | WIRE TYPE:WIRE OUT DATEQ21 118 TIME:1 657 ET TRN:20221 11800452044 SERVICE  REFO1 7028 BNF:YNS FUNDING LLC 1D021 0029880 BNF BK:OPTIMUMBA NK ID:05701  5096 PMT DET:CED7SBSTA POP Services |
|  |  |  |  | **1,509,966.68** |  |

EXHIBIT 5
Page 84

# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher Celentino (131688)<br>Christopher B. Ghio (259094)<br>Yosina M. Lissebeck (201654)<br>Dinsmore & Shohl LLP<br>655 West Broadway, Ste 800, San Diego, CA 92101<br>Tele: (619) 400-0500<br><br>M. Trent Spurlock (KY Bar No. 88569)<br>Suzanne M. Marino (99070)<br>Dinsmore & Shohl LLP<br>101 S. Fifth St., Ste 2500, Louisville, KY 40206<br>Tele: (502) 585-2207<br>(Admitted pro hac vice) | **DEFENDANTS**<br>YNS Funding, LLC, a New York limited liability company; Aly Management, LLC, a New York limited liability company; and Yitzchok Blum, an individual;<br><br>**ATTORNEYS** (If Known) |

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] Creditor
- [x] Trustee
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Other

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] Creditor
- [ ] Trustee
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Other

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turover; and (6) Aiding and Abetting Against Blum

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- [x] 11-Recovery of money/property - §542 turnover of property
- [ ] 12-Recovery of money/property - §547 preference
- [x] 13-Recovery of money/property - §548 fraudulent transfer
- [ ] 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- [ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- [ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- [ ] 61-Dischargeability - §523(a)(5), domestic support
- [ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability - §523(a)(8), student loan
- [ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- [ ] 71-Injunctive relief- imposition of stay
- [ ] 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- [ ] 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- [ ] 01-Determination of remove d claim or cause

**Other**
- [ ] SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- [ ] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| [x] Check if this case involves a substantive issue of state law | [ ] Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| [ ] Check if a jury trial is demanded in complaint | Demand $ 1,634,966.68 |
| Other Relief Sought | |

ATTACHMENT
Page 86

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Christopher B. Ghio | | |
| DATE<br>March 18, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher B. Ghio<br>Trent Spurlock<br>Suzanne M. Marino | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.